IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROSEMARY COLLINS,

　　　　　　　　　　Plaintiff,

　　　v.

ENERGIZER HOLDINGS, INC. and its wholly-owned
subsidiary, ENERGIZER MANUFACTURING, INC.

　　　　　　　　　Defendants.

OPINION and ORDER

21-cv-390-jdp

---

Plaintiff Rosemary Collins ran a production line at a battery manufacturing plant owned by defendant Energizer Holdings, Inc. Energizer fired Collins in 2019, after a human resources investigation determined that Collins had violated Energizer's code of conduct on at least three occasions. Collins has sued Energizer under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act, contending that she was subjected to a hostile work environment and that she was wrongfully terminated on the basis of her sex and age.

Energizer moves for summary judgment, Dkt. 38, and the court will grant the motion. Collins has not established a basis to hold Energizer liable for her hostile work environment claim because she has adduced no evidence that Energizer was aware of any of the harassment she alleges. As for the wrongful termination claim, Energizer provided a non-discriminatory reason for Collins's termination: Energizer had received numerous complaints from her coworkers about her workplace behavior. Collins alleges that the complaints were fabricated by a group of male employees who wanted to get her fired, and she says that Energizer's investigation into her alleged misconduct was biased and unfair. But nothing in the record suggests that Energizer held its beliefs about Collins's workplace misconduct in bad faith. The court will dismiss Collins's claims and close the case.

## UNDISPUTED FACTS

The court begins with four evidentiary issues.

First, Energizer asks the court to disregard Collins's proposed findings of fact for her failure to follow the court's summary judgment procedures. Dkt. 79, at 2. Energizer contends that many of Collins's proposed findings of fact are deficient in at least one of the following three ways: (1) they are not limited to a single factual proposition; (2) they are supported with citation to lengthy exhibits without specific reference to the part of the exhibit supports the proposed fact; and (3) they contain argument and statements of opinion. The court will not disregard Collins's evidence altogether. But the court disregarded any proposed facts that were argumentative or conclusory, contain multiple distinct factual propositions, or were not supported with a citation to a specific part of an exhibit in the record. *See, e.g.*, Dkt. 81, ¶¶ 7 (citing 72 pages of deposition testimony to support a proposed fact), 36 (proposing several distinct facts), 185 (describing a human resources investigation as "blatantly deficient, flawed, and biased").

Second, much of the evidence Collins relies on is inadmissible. Collins opposes Energizer's motion primarily on the basis of declarations from herself and other Energizer employees. *See* Dkts. 61–76. But many of the declarations Collins submitted include statements that are not based on the declarant's personal knowledge. For example, many declarants aver facts about the knowledge, intentions, and motivations of others, *see* Dkt 67, ¶ 27; Dkt. 66, ¶ 5, or about statements made by others which the declarant did not themselves see or witness, *see* Dkt. 62, ¶ 17; Dkt. 63 ¶¶ 10, 35. The court disregarded facts in a declaration if they were not based on the declarant's personal knowledge.

Third, Collins did not consolidate her objections to Energizer's proposed facts in her response. Instead, she filed a response to Energizer's proposed facts, Dkt. 59, as well as a separate list of objections to Energizer's evidence, Dkt. 60. The purpose of proposed findings of fact is to allow the court to determine which material facts are genuinely disputed. That purpose is frustrated if a party does not include all grounds for its objections to a proposed fact its response. Nevertheless, the court considered Collins's objections in deciding whether a proposed fact was genuinely disputed.

Fourth, Collins has moved to strike the evidence that Energizer submitted in support of its reply brief. Dkt. 85. The court will grant the motion in part. "It is appropriate to submit new evidence in order to dispute evidence that the other side submitted with its opposition brief." *Cohen v. Minneapolis Jewish Fed'n*, 286 F. Supp. 3d 949, 954 (W.D. Wis. 2017). One of Energizer's submissions, an internal job description for a Collins's role at Energizer, Dkt. 84-1, was provided to rebut Collins's proposed fact about her job responsibilities. *See* Dkt. 81, ¶ 52. (The document was also used as an exhibit during Collins's deposition.) But Energizer's other submissions—declarations from Energizer employees involved in the decision to terminate Collins, Dkt. 81; Dkt 83—are more problematic. Although the declarations address general issues that Collins raised in her opposition brief, they contain new information that is not directly responsive to facts already in the case. The court did not consider the new information in those declarations in determining whether a proposed fact was properly supported.

With those preliminaries in mind, the following facts are undisputed except where noted.

## A. Background

Plaintiff Rosemary Collins began working at a battery manufacturing plant in Fennimore, Wisconsin in 1999. At the time, the plant was operated by Rayovac, which later became Spectrum Brands. Spectrum Brands operated the plant until January 2, 2019, when the plant was purchased by Energizer.

Collins started working at the plant as a machine operator. Six months later she became a cathode production technician, which is the position she held until she was fired in 2019. In that role, Collins ran a production line that made AAA batteries. (Despite the change in title, employees at the plant call technicians who run a line "operators.") Collins was assisted by a "rover," a roaming employee who helped operators run their lines. Rovers would support operators by filling in during breaks, cleaning, and refilling hoppers with new cans.[1] Each crew also had several maintenance workers responsible for fixing mechanical issues on the lines as needed. Collins was primarily assigned to D crew, the night shift, but she would occasionally work with other crews when she worked overtime or switched shifts.

## B. First complaint about Collins's behavior

In 2011, Collins was working the night shift with Luis Bonilla. Bonilla was a utility employee, which meant that he covered positions as needed throughout the plant. Collins believed that Bonilla had reported Collins for taking a long break, and the two got into an argument. Collins and Bonilla recall the discussion differently. Bonilla says that Collins threatened to cut his tires; Collins says that she "jokingly" told Bonilla that some day he would piss someone off enough that he or she would slash his tires. Dkt. 63, ¶ 4.

---

[1] The parties don't explain what "cans" are. The court infers that they are the metal housings used to make batteries.

4

Bonilla complained to human resources about the incident. Jim Stoeffler, a human resources employee, had a meeting with Collins and night shift manager Henry Bierman. Stoeffler asked Collins whether she had made any racial or threatening remarks to Bonilla, and Collins denied that she had made inappropriate comments of any kind. Stoeffler determined that Collins had threatened to slash Bonilla's tires and suspended her for three days.

## C. Alleged harassment from 2013–2016

In 2013 or 2014, a male employee, Ben Zaderzil, taped a glass of water to the top of the line door. Dkt. 63, ¶ 13. When Collins opened the door, the water poured on her head. She says that the "male employees had all gathered to watch" and that they laughed at her. *Id.*

About a week or two later, an unidentified male employee moved the work clock ahead by 15 minutes. When Collins left the line at what she believed was 5:00 a.m., the shift manager made her change back into her work clothes and return to the line. About two weeks later, someone moved the clock backwards by 25 minutes, which caused Collins to stay on the line after her shift ended.

Collins says that "there were more things that happened" but she does not remember any other specific incidents of harassment that occurred before 2017. Dkt. 63, ¶ 15.

## D. Alleged harassment from 2017–2019

Frank Riley was the rover for the D crew from 2013 to 2018. Initially, Collins and Riley got along well. That changed in 2017, after Collins came to believe that Riley had told Collins's shift manager that she was taking overly long breaks. After that, Collins "stopped talking to Riley." *Id.*, ¶ 16. Soon after, Riley started paying less attention to Collins's line. Riley would rarely watch Collins's line when she went on break, and he stopped filling the hopper on Collins's line with new cans. Riley continued to fill the hoppers on the male operators' lines.

5

Collins believes that Riley stopped helping her because he was mad that Collins had complained about him to other employees, Dkt. 81, ¶ 78, and because Riley wanted Collins's operator position. Dkt. 63, ¶ 19.

Around the end of 2017, the night shift manager, John Lyne, asked Collins what was going on between her and Riley. Collins said that there was nothing going on. In response, Lyne told Collins to "nicely ask" Riley to fill her can hopper. Collins was offended because she didn't think that Lyne would have told a male operator to nicely ask a rover for help.

In 2018, Bonilla walked by Collins's work area, grabbed her extra chair, and slammed it into her table.

At some point in 2018 or 2019, a male employee told Collins that she had a "turkey neck" and gray hair, and asked her when she was going to retire. Collins can't remember who made the comment or when it was made. Riley later asked Collins whether she was going to retire once or twice. Dkt. 55-1 (Collins Dep. 122:10–14).

In late 2018, the factory started using cheaper dye in its battery production. As a result, production lines started experiencing mechanical issues. Collins's line in particular was "more temperamental" than the other lines and would break down more often than others. Dkt. 55-1 (Collins Dep. 137:10–12). Around this time, the two maintenance employees assigned to D crew, Dwight Kuster and Don Hardy, began ignoring Collins's requests for help on her line. When Collins's line would go down, they refused to help her fix the problem and said that the problems were caused by operator error. Collins testified that this happened "several times," although she couldn't remember how many times it happened specifically. *Id.* at 135:16–21. Another maintenance employee on D crew, Kyle Cathman, would help Collins make necessary

adjustments if neither Kuster nor Hardy were willing to do it. *Id.* at 136:1–3. But Hardy would also make adjustments after Collins called for maintenance two or three times. *Id.* at 137:3–6.

Between 2018 and 2019, employees made 10 to 15 announcements over the intercom wishing Collins a happy birthday on days that were not her birthday. The final such announcement was made by the new night shift manager, Jamie McCartney, who wished Collins a happy 75th birthday. At the time, Collins was 66 years old.

### E. Second complaint about Collins's behavior

In September 2018, Dustin Mara, the plant's human resources manager, received a verbal complaint about Collins's behavior in the workplace. Mara does not remember who made the complaint, nor does he remember the specific behavior being complained of. (Mara now requires that complaints be made in writing. Dkt. 55-2 (Mara Dep. 100:1–5)). To investigate the complaint, Mara interviewed Riley, Kuster, and Terri Jordan, a female utility employee.

Riley told Mara that Collins was "pissed off at everyone," and that she was angry at him for not filling her can hopper. Dkt. 42-3, at 2 (Mara's investigation notes). He also said that Kuster had seen her throw a sample board. Kuster told Mara that Collins was grouchy, complained every time she filled the can hopper, and "wants everyone to run her line." Dkt. 56-3 (Kuster Dep. 46:14–16). Jordan told Mara that she had moved off the night shift to get away from Collins and that Collins wanted others to fill her hoppers.

When Mara spoke with Collins about her behavior a few days later, Collins said that her behavior was fine. Mara told Collins that she needed to try to work with those around her and gave her a brochure about an employee counseling program.

**F.  Third complaint about Collins's behavior**

In late 2018, Riley transferred to a different area of the factory. In early 2019, a new employee, Carl Vandenberg, took over as the rover for D crew. In July 2019, Vandenberg complained to Mara that Collins had been saying rude things about him behind his back: specifically, he had heard that she called him "fucking retarded," a "piece of shit," and said that if Vandenberg was "any lazier [he'd] stink." Vandenberg said that Collins "ma[de] coming to work harder and harder." Dkt. 42-5, at 1 (Mara's investigation notes).

Mara interviewed nine employees about the alleged comments, including Kuster, Hardy, and Bonilla. Kuster reported that Collins had improved from last fall, but he had heard Collins make the comment that if Vandenberg was "any lazier, he'd stink." *Id.* at 2. Hardy said that he had heard Collins complain about Vandenberg, but he hadn't heard her say anything vulgar or explicit. Bonilla said that he observed Collins mock Vandenberg and complain about him to other employees. He also said that Collins was "making the work area hostile" and that "something needs to be done." *Id.* at 5.

Mara met with Collins, who denied that she had made any comments about Vandenberg. Mara then interviewed Lanette Fish. Mara's reasons for interviewing Fish are genuinely disputed: Mara's notes from his meeting with Collins state that Collins asked Mara to speak to Fish, *id.* at 5, but Collins testified that she did not mention Fish during their meeting. When Mara met with Fish, she said that she had not spoken with Collins for a month and that Collins called her a "fucking bitch." *Id.* at 6. Fish said that another employee, John Fjeslted, could corroborate her story. Mara met with Fjeslted, who said that he had heard Collins call Fish a "stupid fucking bitch." *Id.* at 7.

Following the investigation, Mara determined that Collins's comments about Vandenberg and Fish violated the company's code of conduct and placed her on a three-day suspension. Energizer issued a "Final Written Warning and Suspension," which stated that the next step of discipline may result in her termination. Her suspension began on Friday, July 12.

## G. Fourth complaint about Collins's behavior

The following Monday, July 15, Riley submitted a complaint about Collins to the employee helpline on the Energizer website. The complaint stated that Collins was creating a hostile work environment but the "HR department here have for the most part ignored it." Dkt. 43-2, at 1. He said that Collins had told a maintenance employee that "if she had some rope she'd F--/ing [sic] hang me," (meaning Riley) and that Collins had called a Bonilla an "F—ing [sic] porch monkey." *Id.*

The complaint was forwarded to Kathy Rehmer, Energizer's chief compliance officer. The next day, July 16, Rehmer spoke to Riley by phone. Riley alleged that Collins had threatened to slash Bonilla's tires in 2011 and that she had called Bonilla a "porch monkey" in 2018. Dkt. 43-3, at 1. Riley told Rehmer that Collins had received counseling for her behavior back in 2018, but it hadn't helped. Riley said that he and others at the plant felt that a three-day suspension was not an appropriate punishment for her behavior.

Rehmer then spoke with Mara to gather information about his 2018 investigation into Collins's behavior. Mara said that Riley had mentioned the "porch monkey" comment in 2018, but Mara hadn't recorded that comment in his investigation notes. Rehmer asked why local HR had not taken more serious action following the 2018 investigation. Mara said that Collins had been going through a rough situation, so he felt that coaching was appropriate. Dkt. 43-3, at 1–2.

Rehmer spoke with Bonilla that same day. He said that he had heard from other employees that Collins had called him a porch money. Bonilla also said that he believed that Collins created a threatening and hazardous work environment. Rehmer did not interview Collins during the investigation.

Energizer fired Collins the next day, on July 17. Dkt. 42-6. The termination letter stated that Collins had been fired for violating of the Energizer Code of Conduct in 2011, 2018, and 2019. The decision to terminate Collins was made by Jake Jansen, the plant's production manager, in consultation with Jeff Birchman, the plant's senior HR manager, and Mara. Dkt. 43-8, at 2–3. They also "discussed [Collins's] termination with [] Rehmer." *Id.*

A few days later on July 21, Energizer received an anonymous telephone complaint about Collins's termination. The caller said that Riley, Bonilla, Kuster, and a new employee had colluded to get Collins fired. The complaint also said that Kuster and Hardy would not help Collins with mechanical issues on her line when she asked for help, and that they treated the male operators more favorably. The caller was later identified as Kyle Cathman.

Mara interviewed Kuster and Hardy about the call. Kuster told Mara that he had never refused to fix someone's line. Mara asked whether Kuster treated Collins differently because she was a woman. Kuster said that he didn't, but he noted that rovers were more likely to help operators who made an effort to help the rovers. Hardy said that he had never refused to fix someone's line and said that there was no truth to the notion that Collins was treated differently based on her gender. Dkt. 42-7, at 2–3. Mara did not interview any other employees about the anonymous complaint. Mara concluded that the anonymous complaint was meritless and did not take further action.

Energizer received another anonymous complaint to the helpline a month later. The caller said that the allegations about Collins made by male employees were untrue and asked for the situation to be reviewed. The caller was later revealed to be Collins herself. Mara concluded that the issues raised by the call were redundant to the issues raised by the previous anonymous helpline complaint and did not conduct another investigation.

The court will address additional relevant facts in the analysis section of the opinion.

ANALYSIS

Collins brings claims under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act (ADEA), contending that she was subjected to a hostile work environment and wrongfully terminated on the basis of her sex and age. Courts use the same framework to analyze employment discrimination claims under both statutes. *Broom v. Aztalan Eng'g, Inc.,* No. 16-CV-262-JDP, 2018 WL 2223667, at *4 (W.D. Wis. May 15, 2018); *see Barricks v. Eli Lilly & Co.,* 481 F.3d 556, 559 (7th Cir. 2007).

As the moving party, Energizer is entitled to summary judgment if it shows that there are no genuine issues of material fact and is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court views the evidence in the light most favorable to Collins and draws all reasonable inferences in her favor. *Miller v. American Family Mutual Ins.,* 203 F.3d 997, 1003 (7th Cir. 2000). But Collins has the burden to adduce evidence that would allow a reasonable jury to find in her favor on her claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

11

## A.  Hostile work environment

Discrimination under Title VII and the ADEA includes "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To succeed on her hostile work environment claim, Collins must show that: (1) she was subjected to unwelcome harassment; (2) the harassment was based on a protected characteristic; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007).

It is undisputed that Collins was subjected to unwelcome harassment. As for the other three elements, Energizer has creditable arguments for why Collins has failed to meet her burden on each of them. Collins has not shown that much of the harassment she experienced was because of her sex or age. Collins herself believes that Riley stopped helping her because he wanted her operator position, and she testified that Kuster and Hardy stopped helping her because they were tired of making frequent repairs to her line, Dkt. 55-1 (Collins Dep. 137:13–16, 138:4–8). As for the severity of the harassment, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Collins identifies only a few instances of harassment over a nine-year period, so the harassment was not pervasive. And although Collins's coworkers were occasionally rude or unhelpful, that is not the sort of severe verbal or physical harassment that can support a hostile work environment claim. *Cf. Lapka v. Chertoff*, 517 F.3d 974 (7th Cir. 2008) ("[A]ssaults within the workplace create an objectively hostile work environment for an employee even when they are isolated.").

But even if Collins had met her burden on the second and third elements, her claim would fail because she has not established a basis to hold Energizer liable. Courts evaluate the basis for employer liability differently depending on whether the alleged harassment was perpetrated by supervisors or coworkers. When the harassing employee is a supervisor, the employer is strictly liable if the harassment culminates in a tangible employment action. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). But when the harassing employee is the victim's co-worker, the employer is liable only if "it failed to take appropriate remedial measures once apprised of the harassment." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809 (7th Cir. 2000). Generally, the law does not consider an employer to be apprised of the harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999) (internal quotation omitted). However, an employer may have constructive notice if the harassment was obvious. *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1046 (7th Cir. 2000).

Here, Collins has adduced no evidence that she was harassed by a "supervisor," as that term is meant in the Title VII context. An employee is a supervisor only if he or she is empowered to take tangible employment actions against the victim. *Vance*, 570 U.S. at 424. A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* Collins says that she was harassed by the night shift managers who supervised D crew and contends that they were supervisors because they were not members of the union. Dkt. 81, ¶ 6. The court takes Collins to argue that the shift managers were supervisors for purposes of the National Labor Relations Act (NLRA), which

provides that individuals who are "employed as a supervisor" are ineligible to join a bargaining unit. *See* 29 U.S.C. § 152(3).

But the NLRA's definition of a supervisor is broader than Title VII's. The NLRA definition includes those with authority to "assign, reward, or discipline other employees, or responsibly to direct them." 29 U.S.C. § 152(11). In the discrimination context, "the ability to direct another employee's tasks is simply not sufficient" to support vicarious liability for the directing employee's actions. *Vance*, 570 U.S. at 424; *see also Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) ("[A]n employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context."). Collins provides no evidence that any of the night shift managers could affect a significant change in her employment status by firing, hiring, or reassigning her, so she hasn't shown that they were "supervisors" under Title VII.

Because Collins was not harassed by a supervisor, she needed to show that she tried to inform Energizer about the harassment or that the harassment was so obvious that Energizer had constructive notice. She has not made either showing. It is undisputed that the Energizer handbook instructed employees to notify their supervisor, manager, or the Human Resources department about any workplace misconduct and that Energizer maintained an online helpline where employees could submit complaints anonymously. And it's undisputed that Collins knew about the reporting policies and the helpline. *See* Dkt. 80, ¶ 21. Despite this, Collins never reported any instances of discrimination or harassment in the workplace during her employment.

Collins states that she did not report the harassment because she was afraid that she would lose her job if she complained. "An employee's subjective fears of confrontation,

14

unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 644 (7th Cir. 2000). To show that her fear was well-founded, Collins relies on information in her declaration: specifically, she stated that she was afraid to report harassment because a human resources employee, Jim Stoeffler, took Bonilla's side on his 2011 complaint that Collins had threatened to slash Bonilla's tires. Dkt. 63, ¶ 40. She also says that Stoeffler threatened to fire her if she "talked about [the] incident at work." *Id.*, ¶ 6. But in Collins's deposition, she testified that no one in human resources or management had given her reason to believe that she would be terminated if she reported harassment. Dkt. 56-1 (Collins Dep. 88:3–14). And when Collins was asked why she believed she would be fired if she complained, she said that "[she] just thought that when you worked in a factory, that they get people that [are] complaining all the time, so I just kept my mouth shut." *Id.* at 177:23–178:4.

The sham-affidavit rule prevents a party from relying on a declaration that contradicts the party's prior deposition or other sworn testimony. *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). The rule is applied "to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010). Collins doesn't explain the contradictions between her deposition testimony and her declaration, so the court will disregard Collins's statement that she feared reporting because of Stoeffler's comment.

But even if Stoeffler had made that comment, it wouldn't excuse Collins's failure to report the alleged harassment. It was not reasonable for Collins to believe that she would be fired for reporting harassment in 2019 based on a vague statement made by a human resources employee eight years earlier. Moreover, an employee's fear about reporting to a specific

manager does not excuse an employee's failure to report harassment if the company provides other ways to report harassment, such as a phone line where employees can make anonymous complaints. *See Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 631 (7th Cir. 2019). Collins could have made an anonymous complaint on the Energizer helpline prior to when she was terminated, but she did not do so.

Collins has not shown that the harassment was so obvious that Energizer had constructive notice. She adduces no evidence that Energizer was aware of the specific incidents of harassment she alleges, including the alleged pranks and mean comments. Collins says that the breakdowns on her line would show management that her co-workers were not helping her. But nothing in the record suggests that Energizer knew that the lines were down because her coworkers failed to help her, much less that that their unhelpfulness was the result of sex- or age-based discrimination. Because Collins has not established a basis to hold Energizer liable for any alleged harassment, her hostile work environment claim fails.

## B. Wrongful termination claim

To succeed on her wrongful termination claims under Title VII and the AEDA, Collins must show that her sex and age were "but-for" causes of her termination. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020) (Title VII); *Marnocha v. St. Vincent Hosp. & Health Care Ctr.*, *Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (ADEA). Collins contends that she can prove her claims under the indirect method and burden-shifting approach set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See* Dkt. 58, at 25 (citing *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007)). Under the indirect method, Collins would need to make a prima facie showing that she was (1) terminated from a position that (2) she was qualified for and (3) similarly-situated employees who did not share her protected characteristics were

16

treated more favorably. *Barricks*, 481 F.3d at 559. If Collins makes this showing, the burden shifts to Energizer to provide a legitimate, non-discriminatory reason for its action; and if Energizer makes that showing, the burden shifts again to Collins to show that the reason was pretext for discrimination.

The *McDonnell Douglas* framework can be an efficient way to organize, present, and assess evidence in discrimination case. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). But the Seventh Circuit has encouraged district courts to focus on the central issue, which is whether the evidence as a whole would permit a reasonable factfinder to conclude that the plaintiff's age, sex, or other protected trait caused the employer's adverse action. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504–05 (7th Cir. 2017). Regardless of the method of presentation, the court will consider the defendant's reasons for its actions, and assess the plaintiff's evidence that those reasons are a pretext for discrimination. *Id; see also Hitchcock v. Angel Corps, Inc*., 718 F.3d 733, 738 (7th Cir. 2013) ("The prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action.").

Energizer provided a legitimate, non-discriminatory reason for terminating Collins: it says that Collins violated the company's code of conduct by making rude and threatening comments to her coworkers. To establish pretext, it is not enough for Collins to adduce evidence that Energizer's stated reason for her termination was inaccurate or unfair. *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). Instead, Collins must show that Energizer's stated reason is a lie. *Arrigo v. Link*, 836 F.3d 787, 796 (7th Cir. 2016). To create a genuine dispute of material fact about pretext, Collins must "identify such weaknesses, implausibilities,

inconsistencies, or contradictions" in Energizer's stated reasons "that a reasonable person could find [them] unworthy of credence." *Coleman*, 556 F.3d at 852.

In determining whether a plaintiff has adduced evidence of discrimination, the court must look to the reasons offered by the decisionmakers behind the adverse employment action. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) ("it is the motivation of the decisionmaker that matters in the [discrimination] context."). Here, the parties responsible for firing Collins were Mara, Jake Jansen, Jeff Birchman, and Kathy Rehmer. If Mara, Jansen, Birchman and Rehmer terminated Collins because they honestly believed that she had made rude and threatening comments to other employees—even if this reason was "foolish, trivial, or baseless"—Collins's claims fail. *Coleman*, 556 F.3d at 852 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007)).

Collins has not adduced evidence that would allow a rational factfinder to infer that Energizer's reasons for her termination were pretextual. She points to several categories of evidence, none of which suggest that management held their beliefs about Collins's workplace conduct in bad faith.

### 1. Inadequate investigation

Collins contends that Energizer's investigations into the misconduct allegations made against her were so inadequate that they demonstrate pretext. She identifies several purported deficiencies in the investigations, including that she was never provided with the full details of the allegations against her; Mara and Rehmer did not interview witnesses on her behalf; Energizer believed Bonilla and Vandenberg, "both of whom had criminal records," over her, *see* Dkt. 58, at 19; Energizer relied on hearsay evidence; the interviewees did not give detailed answers; interviews were short; interviewees were never given copies of any interview notes, so

they were not able to confirm that the notes correctly reflected their statements; and Rehmer did not interview Collins as part of her investigation, even though she said in her declaration that it is "standard practice" to interview the accused employee, *see* Dkt. 68, ¶ 4.

The Seventh Circuit has expressly rejected the theory that an impulsive or shoddy investigation demonstrates discriminatory intent. *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 678 (7th Cir. 1997). Energizer's investigations weren't perfect. But Collins had to do more than show that the investigation was unfair to her; she needed to adduce evidence to show that Mara, Rehmer, Jansen, and Birchman *did not believe* that Collins had engaged in workplace misconduct. None of the deficiencies she identifies suggest that Mara and Rehmer undertook their investigations merely to provide cover for discriminatory motives. Mara and Rehmer collectively interviewed over a dozen employees, and many of those employees corroborated the initial misconduct allegations against Collins.

As evidence that Energizer conducted its investigations in bad faith, Collins identifies what she contends are two inconsistencies between Mara's notes and other evidence in the record. First, Mara's notes contain statements that Kuster later couldn't remember making. Specifically, Mara's notes say that Kuster "couldn't deal with" Collins and that Collins's "attitude sucks." In his deposition, Kuster testified that he couldn't remember whether he made those comments. Dkt. 55-3, at 56:22–57:3. Kuster's failure to remember his exact words isn't inconsistent with Mara's notes. And Kuster didn't dispute that the notes captured the substance of his conversation with Mara; he remembered saying that Collins was "contrary" and that she "doesn't help anyone."

Second, Collins says that Lanette Fish could not have told Mara that Collins called her a "fucking bitch" because Fish later gave Collins a handwritten note saying that she never said

anything negative about Collins. *See* Dkt. 55-60. The note is inadmissible hearsay, and Fish did not sit for a deposition or submit a declaration in this case. Collins identifies no admissible evidence that Mara's notes do not accurately reflect Fish's statements during their interview. Moreover, Mara substantiated the allegation by talking to another employee who confirmed that he had overheard Collins make the comment. The purported inconsistency does not show that Mara reached his conclusion about Collins's behavior in bad faith.

### 2. Inconsistent explanation

Collins says that Energizer has changed its story about who was responsible for firing Collins, which she contends is evidence of pretext. Collins alleges that Energizer previously said that Mara, Jansen, and Birchman were the people responsible for firing Collins, but later said that Kathy Rehmer was the principal decisionmaker. Collins provides no evidence to support the assertion that Energizer has been inconsistent on this point. The record shows that Energizer has identified Rehmer as a person involved in the decision since at least December 2021, when it responded to Collins's interrogatory on the issue. *See* Dkt. 56-48 at 12–13. And Energizer has never changed its proffered reasons for why it terminated Collins.

### 3. False allegations

Collins contends that Energizer's proffered reasons for firing her were pretextual because the underlying allegations about her misconduct were false. Collins contends that she did not threaten to cut Bonilla's tires or call him a porch monkey, call Vandenberg lazy, call Fish a "fucking bitch," or tell another employee that she wanted to hang Riley. And she says that the allegations were the result of multiple employees colluding to get her fired. Whether Collins actually said those things is genuinely disputed. But the dispute is immaterial to whether Energizer's reasons for firing Collins were pretext. The key question isn't whether

Energizer was correct that Collins had done or said those things; it's whether it believed that she had. It is undisputed that multiple employees told Energizer that Collins had engaged in misconduct, and Collins doesn't provide any evidence that Energizer knew, or should have known, that the allegations against her were false.

### 4. Procedural violations

Collins states in a conclusory fashion that Energizer did not follow its progressive discipline policy when it fired her. Dkt. 58, at 23. A company's failure to follow its own internal procedures can raise an inference of discriminatory motivation. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) (failing to follow hiring procedures was circumstantial evidence of discrimination in hiring). But Collins does not explain how Energizer violated its policy or explain what Energizer was required to do differently. And the record shows that Collins did receive progressive discipline: Collins was given coaching and two suspensions prior to her termination.

### 5. Similarly situated employees

Collins contends that she can demonstrate pretext by showing that similarly situated male employees were not terminated. To be similarly situated to Collins, the employee must be "directly comparable to her in all material respects." *Burks v. Wis. Dep't. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Generally, a plaintiff must show that a proposed comparator "dealt with the same supervisor, [was] subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008).

Collins identifies five male employees who were accused of similar misconduct to her who were not fired. *See* Dkt. 81, ¶¶ 276, 283, 286, 290, 297. Daniel McClimans was accused of using the "N" word when referring to a Black employee and was given coaching; Doug Digman was twice accused of non-specific "harassment and bullying" and received no discipline; Luis Bonilla was accused of slapping a female employee's wrist during an argument and received a suspension; Steven Wright was accused of making inappropriate comments and jokes to female employees and received a warning; and Bill Popp poked a subordinate in the chest and was given a three-day suspension.

The employees Collins identifies are not similarly situated to her, for two reasons. First, not all of the accusations against the male employees were substantiated following an investigation, as hers had been. Human resources determined that the complaints against McClimans and Digman were unsubstantiated. *See* Dkt. 56-31 (Digman), Dkt. 56-29 (McClimans). As for Bonilla, human resources determined that both Bonilla and the female employee had violated Energizer's policy against touching and gave both parties a suspension. *See* Dkt. 56-5 (Bonilla Dep. 65:7–20).

Second, none of the employees Collins identifies had as many incidents of discipline as she did. "Without a similar disciplinary history, [a comparator] cannot be considered similarly situated." *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008). Collins was fired after Energizer determined that she had violated the code of conduct on at least three occasions, and she had received a warning and two suspensions prior to her termination. Collins hasn't adduced evidence that any of the proposed comparators had been investigated or disciplined prior to engaging in the misconduct she identifies. Nothing suggests that Collins's

proposed comparators had a similar disciplinary history to hers, so Collins hasn't shown that she is similarly situated to them.

### 6. Energizer's treatment of other women

Collins contends that the reasons for her firing were pretextual because Energizer has a pattern of treating women less favorably. This argument fails. "A plaintiff may use pattern evidence of disparate treatment even if that evidence is not rigorously statistical, although, standing alone, it is insufficient evidence to withstand summary judgment." *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007). Collins says that two women and nine men have the subject of harassment complaints since 2019, but only the two women—Collins and Tina Miles—were fired following an investigation. She also says that another female employee, Courtney Kjos, was fired for "false reasons." Dkt. 58, at 34. Without additional information about the total number of employees fired over that period, evidence that three women were fired does not show that Energizer had a pattern of terminating women more often than men. But even if Collins could establish that Energizer consistently treated women less favorably than men, that evidence would not prove that Collins was terminated for a discriminatory reason. *See Baylie v. FRB,* 476 F.3d 522, 524 (7th Cir. 2007). In light of the volume of substantiated complaints against Collins, evidence that two other women were fired would not allow a reasonable factfinder to conclude that Energizer had discriminated against her.

## C. Discovery issues

Finally, Collins asks the court to deny Energizer's motion because she was unable to conduct adequate discovery before her opposition materials were due. Dkt. 58, at 15. On August 10, 2022, Collins filed a motion for an extension of time under Federal Rule of Civil

Procedure 56(d), Dkt. 45, on the ground that the court had not yet ruled on her motion to compel additional discovery responses, Dkt. 26. Following a hearing on August 17, 2022, Magistrate Judge Crocker granted both of Collins's motions in part. The court set a new summary judgment response deadline of September 6 and ordered Energizer to disclose some additional information by September 16. Dkt. 49; Dkt. 96-7 (hearing transcript).

Collins now contends that she was prejudiced because (1) Energizer did not produce a "full listing [sic] of employees' gender, ages, and employment dates," and (2) she did not have Energizer's discovery responses by the time her summary judgment opposition materials were due. These arguments do not forestall summary judgment. If Collins believed that she did not have enough information to respond to Energizer's motion, she should have sought another extension of time prior to the response deadline.

But Collins's untimely request also fails on its merits. The mere fact that discovery is incomplete is not enough to prevent summary judgment. *Farmer v. Brennan*, 81 F.3d 1444, 1450 (7th Cir. 1996). If a party seeks an extension of time to conduct discovery under Rule 56(d), she must show by affidavit or declaration specific reasons discovery should be extended, "which requires more than a fond hope that more fishing might net some good evidence." *Davis v. G.N. Mortgage Corp*. 396 F.3d 869, 885 (7th Cir. 2005). Collins does not explain what she was waiting for Energizer to produce or why it is material to her case. The only specific evidence Collins identifies, a "full listing" of employees' demographic information, is not something that Energizer was ordered to produce. *See* Dkt. 96-7, at 6:9–11 (concluding that the employee information Energizer had already provided was adequate). And Collins's vague argument that she has "been denied the ability to either take deposition testimony or contact several witnesses

24

and/or receive evidence to support her claims," Dkt. 58, at 15, is not enough to extend discovery or deny Energizer's summary judgment motion.

ORDER

IT IS ORDERED that:

1.  Plaintiff Rosemary Collin's motion to strike defendant's reply brief, Dkt. 85, is GRANTED in part and DENIED in part. The court did not consider non-responsive new information in Energizer's reply declarations.

2.  Defendants' motion for summary judgment, Dkt. 38, is GRANTED. Collins's claims are dismissed with prejudice.

3.  The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered November 22, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge